UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF ILLINOIS

FLOYD MAY, *pro se*,

        PLAINTIFF,

VS.                                       04-1127

PAULA RICH,

        DEFENDANT.

<u>MEMORANDUM OPINION AND ORDER ON POST TRIAL MOTIONS</u>

     This is a prisoner civil rights action under 42 U.S.C. § 1983. The court has jurisdiction under 28 U.S.C. §§ 1331 and 1334. On October 23rd and 24th, 2007, this case was tried to a jury. The plaintiff, an inmate of the Illinois Department of Corrections (IDOC), had two First Amendment claims — denial of access to the courts and retaliation for filing grievances and litigation — and a state law claim, violation of the Illinois Notary Act. The jury returned a general verdict in favor of the plaintiff and against the defendant and awarded the plaintiff $2,388.00 in compensatory damages. The defendant has renewed her motion under Fed.R.Civ.P. 50[1] for judgment as a matter of law and moved conditionally in the alternative for a new trial. The plaintiff has responded.

Access To the Courts

     "The right of access to the courts is the right of an individual, whether free or incarcerated, to obtain access to the courts without undue interference. The right of individuals to pursue legal redress for claims that have a reasonable basis in law or fact is protected by the First Amendment right to Petition and the Fourteenth Amendment right to substantive due process." *Snyder v. Nolen*, 380 F.3d 279, 291 (7th Cir. 2004). An access to the courts claim only arises, however, if the plaintiff suffered "actual injury" from the inability to pursue a non-frivolous claim. *Lewis v. Casey*, 518 U.S. 343, 349-51 (1996); *May v. Sheahan*, 226 F.3d 876, 883 (7th Cir. 2000); *Walters v. Edgar*, 163 F.3d 430, 434 (7th Cir. 1998) (actual injury occurs when plaintiff is blocked from litigating a non-frivolous case).

     The defendant is correct in her argument that the plaintiff suffered no "actual injury" from the dismissal of the thirteen cases in No. 03-1085 to No. 03-1098 (C.D. Ill. 2003) since the records in those cases show that the dismissals were without prejudice and May was at liberty to

---

[1] The motion was taken under advisement by the court at the close of all the evidence.

renew his claims. He chose not to. He tried to reinstate the cases without paying the additional filing fees but, as discussed later in this opinion, the court declined to permit the reinstatement. Since May was not blocked from litigating a non-frivolous case and suffered no "actual injury" from the dismissal of his cases, his claim of denial of access to the courts cannot stand.

## Retaliation for Exercising First Amendment Rights

The essence of May's claims in this regard center on his receiving disciplinary tickets that originated with the defendant for May's use of carbon paper. His argument was that since carbon paper wasn't specifically prohibited by Pontiac Correctional Center (Pontiac) regulations, he was allowed to use it, and Rich's reporting him to Internal Affairs and bringing about disciplinary action against him was retaliation for his grievances within the prison system and his activity in court. There is no question, and the record shows, that May filed grievances against Rich and had disputes with her and other library personnel at Pontiac and also sued IDOC personnel on a number of occasions. There is also no question that Rich initiated disciplinary action against him for his use of carbon paper. Her response to May's claims is that she was acting in support of penological interests and that carbon paper is contraband at Pontiac.

There is no doubt that carbon paper is contraband at Pontiac. It can be and is used to forge signatures, trace symbols and documents. May admitted to forging other inmates' names on trust fund vouchers and passed it off as something common in the institution. On several occasions in the trial May referred to the prison regulations that itemized what items he could rightfully possess as a prisoner. He repeatedly made the point that since he wasn't prohibited from possessing carbon paper, the disciplinary actions against him were retaliatory in nature and not in furtherance of penological interests. No objection was made and the court is reluctant to mix in any more than it already does in *pro se* trials. There should have been a ruling that the itemization of what could be possessed excluded all other items. The ancient maxim *expressio unius est exclusio alterius* applies. "Under the general rule of statutory construction . . . the expression of one or more items of a class implies that those not identified are to be excluded [fn4]." 73 Am. Jur. 2d Statutes § 129. A prisoner at Pontiac is limited as to items of personal property he may possess in his cell. Carbon paper is not among them and for justifiable reasons.

May also argued that Paula Rich in retaliation for his exercise of First Amendment rights sent the fourteen "affidavits"[2] she notarized to the court to secure dismissal of his lawsuits. May denied any knowledge of the fourteen "affidavits" and denied mailing them to the court. The Pontiac work order forms and log book [Def. Ex. 4, 5] show that the "affidavits" were returned to May via the prison mail on April 4, 2003, and that Rich was in the West Cell House where May was housed on April 4, 2003. May claimed Rich was not in the cell house on that date and presented two other inmates who claimed they knew she was not there. One of them was

---

[2]"Affidavits" is really a misnomer and probably a deliberate one by May. The documents were really motions to dismiss voluntarily. No fact of consequence in the contents of the documents was being attested to as true or false.

Demond Reid, May's co-plaintiff in No. 03-1295 (C.D. Ill. 2003) (*infra*). The other was Mark Harris, who is shown on the IDOC Offender Tracking Service as released from Pontiac on March 26, 2003. Reid, the record will show, was on the first gallery while May was on the ninth gallery, nine floors away. May admitted that he wrote to Reid and Harris and told them what he expected them to testify to.

No reasonable trier of fact could reach the conclusion that May was not the author of the "affidavits" and sent them to the library with requests for notarization, or that Rich was not in the West Cell House on April 4, 2003. The institution records gainsay what May contends. How Rich went about notarizing the documents that May sent to her via his request for notarization is the subject of his claims under the Illinois Notary Act discussed subsequently in this opinion.

All May's claims, and the result in this trial, need to be considered against the background of May's litigation history and the dynamics of Pontiac. Life at Pontiac is life in an authoritarian society. It must be. Without authority there would be no discipline or security. There would be chaos. There is a constant tension, a tug of war, a struggle between the penitentiary inmates and their keepers about authority. The keepers must impose authority and maintain it. The inmates seek ways to resist authority and to have autonomy. Autonomy is anathema to an authoritarian society. May is a quintessential example of resistance to authority in the prison. He seeks ways to circumvent the prison restrictions and regulations to satisfy his own aims and desires. He is also an experienced, resourceful and clever litigator, notwithstanding his protests and motions during the trial that he is unable to represent himself. Let me itemize that by considering his litigation history in this district.

> In No. 01-1300 (C.D. Ill. 2001), May brought a civil rights suit against the Pontiac warden, the superintendents, and the director of the IDOC. After some of the parties had been served with process but before any of them had appeared, May moved to dismiss voluntarily without prejudice. The motion was allowed and the case was dismissed without prejudice.

> In No. 01-1520 (C.D. Ill. 2001), May was given disciplinary tickets for trying to organize inmates as petitioners, which was against the prison's regulations. He sued, claiming retaliation for filing grievances, denial of access to the courts, and infringement of his right to free speech. In a trial before a jury, this court granted judgment as a matter of law to the defendants on the basis that they acted in furtherance of valid penological interests. The Seventh Circuit affirmed. No. 05-1473 and No. 05-1647 (7th Cir. Nov. 30, 2007).

> In No. 03-1085 to No. 03-1098 (C.D. Ill. 2003), May filed fourteen cases against the Pontiac librarians, Paula Rich and Mark Spencer. The docket reveals that on April 1, 2003, the court entered a deficiency order concerning missing information and documents in the filed cases. May was given until April 18, 2003 to correct the deficiencies. Instead, he filed motions on April 16, 2003 to voluntarily dismiss each

3

of the fourteen cases.[3] On April 28, 2003, the court dismissed the cases without prejudice. On May 21, 2003, May filed a motion for reconsideration of the dismissal claiming that he did not file the "affidavits." The court held an evidentiary hearing on that motion by video conference on January 27, 2004, and found that May's testimony that he had not sent the "affidavits" to the court was not credible. The court found that Rich had notarized the documents and returned them to May but that the documents presented at the hearing were altered and not in that condition when she notarized them. The court did not vacate the order of dismissal without prejudice. That is the last docket entry and those cases are still terminated.

In No. 03-1295 (C.D. Ill. 2003), May filed a civil rights suit in his own behalf and purportedly on behalf of inmates Demond Reid and Andre Mason claiming Eighth, First and Fourteenth Amendment violations. The court entered summary judgment for the defendants on January 23, 2007. May filed a notice of appeal and the matter is pending on May's motion to proceed on appeal *in forma pauperis,* awaiting May's brief on issues he intends to raise.

In No. 04-1083 (C.D. Ill. 2004), May sued multiple defendants claiming infringement of his First Amendment rights to free exercise of religion and violation of the Religious Land Use Institutionalized Persons Act (RLUIPA). The court entered partial summary judgment in favor of certain defendants on the religious claims. May filed an interlocutory appeal that was ineffective since the case was still pending as to the remainder of the issues and the lone remaining defendant, Runyon. On December 3, 2007, May moved for voluntary dismissal.[4] On December 13, 2007, Runyon responded that he had no objection to the dismissal. In a Rule 16 telephone conference on January 15, 2007, by agreement of the parties, the case as to Runyon was dismissed and the court informed the parties that it would then enter final judgment on the motion for summary judgment that had been partially granted on August 3, 2007. May was advised he should file a new notice of appeal.

No. 04-1127 is the instant case now before the court.

A reasonable trier of fact would not have concluded that Rich was motivated by retaliation in writing May up for discipline for using contraband carbon paper in document preparation when it was her absolute duty to report May for that conduct. A reasonable trier of fact would not have concluded that she mailed fabricated "affidavits" to the court to punish May for complaining in

---

[3]The "affidavits" in contention in this case.

[4]It is noteworthy that May understands that verification is not needed for pleadings in federal court. He didn't verify motions in this case or other cases. Why did he do it in the Paula Rich case? Was he setting all this up?

4

grievances about her work in the library. How could she even have known of the existence of the cases, let alone seek their dismissal, when she had not been served with process? How did it happen then? Well, May is a persuasive person and has a good courtroom presence. Sad to say however, Paula Rich, on the other hand, gave the impression that she was like the school teacher one remembers with whom there was mutual animosity. The question remains: Did May set Rich up for this litigation? That leads the court to consideration of the final claim.

### Violation of the Illinois Notary Act[1]

The jury was instructed that circumstantial evidence was proof of facts from which they might infer other reasonable facts. The Pontiac records [Def. Ex. 4] show that May submitted a work order to the library staff requesting notarial services on the "affidavits" which form the basis of his claim under the Notary Act. The Pontiac records [Def. Ex. 5] further show that Rich was in the West Cell House on the day the "affidavits" were notarized by her and returned by prison mail to May. May knew the procedure that a staff member would come to his cell house and take his acknowledgment. It is a fair inference that, being the savvy inmate that he is, May knew about female staff members' reluctance to come out on the cell galleries. Sharon Eden, a staff member who testified on behalf of the defendant, explained that female staff members were reluctant to go out on the cell gallery because some inmates, on occasion, would throw excrement on them or masturbate in their presence as they walked by. The inmates would act out their resistance to authority. (There is no indication or intimation that May ever acted in that manner or would act in that manner. In all his dealings with the court and in his contacts with staff, he has never exhibited such conduct.)

It is arguable whether Rich went to May's cell and asked him directly if the signatures on the "affidavits" were his. She said she did, but there was impeachment of that recollection by prior inconsistent statements in her answers to interrogatories. But the requirement of the Illinois Notary Act is:

> "A notary public has satisfactory evidence that a person is the person whose true signature is on a document if that person (1) is personally known to the notary."
> 5 Ill. Comp. Stat. 312/6-102.

May was perfectly familiar to Rich. They had been dealing with each other for quite some time and it is apparent that there was friction between them, May pushing back against the authority of the rules of the library and copying of documents, and Rich and the other staff members insisting on adherence to prison regulations. Consistently with the requirements of the Act, Rich could have notarized the documents without asking May if they were his since he was "personally known to her."

The jury was instructed that to find liability under the Act they must find, among other things: "that the defendant notarized documents purporting to be the plaintiff's without determining either from personal knowledge or satisfactory evidence whose true signature was on the documents notarized." The court confesses that it did not instruct the jury, nor was it asked to,

5

that satisfactory evidence would be that the document was signed by someone "personally known to her." But all that aside, as a matter of law, there was no evidentiary basis for finding liability under the Notary Act. Even if Rich did not go to the front of May's cell to notarize the documents, she still acted within the requirements of the Act.

## OTHER ISSUES

The defendant argues that May had no evidence of damages because he was proceeding *in forma pauperis* and had paid only $16.00 of the $2,100.00 in filing fees due in the fourteen cases. He was, however, financially responsible for the entire amount even though his trust account has never had sufficient funds in it to satisfy the obligation. The matter is moot in any event if the analysis in this opinion is correct.

The defendants also argue sovereign immunity as a defense. That is without merit. The case was against Paula Rich individually and in no way was a suit against the State of Illinois. At the very beginning of the trial the court told the jury that the case was against Paula Rich and that the State of Illinois was not a party and explained why the Assistant Attorney Generals were appearing as counsel for Paula Rich.

## CONCLUSION

Since the verdict was a general verdict and the defendant is entitled to judgment as a matter of law on each of the three grounds for liability, the renewed motion under Rule 50 for judgment as a matter of law is allowed. In the alternative, should the Court of Appeals disagree with the court's analysis, and May will certainly appeal, then the alternative motion of the defendant for a new trial is granted conditionally since the verdict is against the manifest weight of the evidence and is a miscarriage of justice and was not fair to the moving party. *See Middle America Tablewares, Inc. v. Mogi Trading Co.*, 100 F.3d 1353, 1367 (7th Cir. 1996).

The court is persuaded that it is more probably true than not that May planned the framework for this case against Rich based on his legal research and experience. It is obvious that he knew that if he sued and ran away he would live to sue another day. That is what he did in No. 01-1300 (C.D. Ill. 2001) (*supra*). That is what he did in No. 04-1083 (C.D. Ill. 2004) as to the defendant Runyon. And, of course, what he did in No. 03-1085 to No. 03-1098 (C.D. Ill. 2003) that is the basis of this case. He knew the provisions of the Notary Act that is set out in the endnote to this opinion. He knew the prison procedures for gaining notarization of documents and the way that notarization would be accomplished. And, significantly, he resented Rich and the authority she exercised over his resistance to the authority of prison regulations. She controlled the library with its resources for research, copying and litigation. The court is persuaded by May's litigation history that he is quite familiar with the Federal Rules of Civil Procedure and knows that

those rules do not require notarized pleadings.[5]  As the court wrote earlier in this opinion, May is a clever and resourceful guy and knew exactly what he was doing and where he hoped it would lead.  And it did.  That is the basis for the court's opinion that the result in this case is a miscarriage of justice.

IT IS THEREFORE ORDERED THAT:

    1). The defendant's motion for judgment as a matter of law or in the alternative conditionally for a new trial [d/e 65] is allowed;

    2). The Clerk is directed to enter judgment in favor of the defendant and against the plaintiff.  The parties shall bear their own costs;

    3). All other pending matters are denied as moot by this order.

Enter this _23rd_ day of January 2008.

**s\Harold A. Baker**
_____
Harold A. Baker
United States District Judge

---

[5]Consider the "affidavits" [Def. Ex. 5 *et seq.*].  The only thing May swears to is that he is the plaintiff and asks for dismissal, volunteering that he is still responsible for the full filing fees thereby preserving, he hopes, his future claim for damages.

**5 Ill. Comp. Stat. 312/6-102. Notarial Acts**

§ 6-102. Notarial Acts. (a) In taking an acknowledgment, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the notary and making the acknowledgment is the person whose true signature is on the instrument.
(b) In taking a verification upon oath or affirmation, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the person appearing before the notary and making the verification is the person whose true signature is on the statement verified.
(c) In witnessing or attesting a signature, the notary public must determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person appearing before the notary and named therein.
(d) A notary public has satisfactory evidence that a person is the person whose true signature is on a document if that person:
  (1) is personally known to the notary;
  (2) is identified upon the oath or affirmation of a credible witness personally known to the notary;  or
  (3) is identified on the basis of identification documents.

➡**5 Ill. Comp. Stat. 312/6-104. Acts Prohibited**

§ 6-104. Acts Prohibited. (a) A notary public shall not use any name or initial in signing certificates other than that by which the notary was commissioned.
(b) A notary public shall not acknowledge any instrument in which the notary's name appears as a party to the transaction.
(c) A notary public shall not affix his signature to a blank form of affidavit or certificate of acknowledgment and deliver that form to another person with intent that it be used as an affidavit or acknowledgment.
(d) A notary public shall not take the acknowledgment of or administer an oath to any person whom the notary actually knows to have been adjudged mentally ill by a court of competent jurisdiction and who has not been restored to mental health as a matter of record.
(e) A notary public shall not take the acknowledgment of any person who is blind until the notary has read the instrument to such person.
(f) A notary public shall not take the acknowledgment of any person who does not speak or understand the English language, unless the nature and effect of the instrument to be notarized is translated into a language which the person does understand.
(g) A notary public shall not change anything in a written instrument after it has been signed by anyone.
(h) No notary public shall be authorized to prepare any legal instrument, or fill in the blanks of an instrument, other than a notary certificate; however, this prohibition shall not prohibit an attorney, who is also a notary public, from performing notarial acts for any document prepared by that attorney.
(i) If a notary public accepts or receives any money from any one to whom an oath has been administered or on behalf of whom an acknowledgment has been taken for the purpose of transmitting or forwarding such money to another and willfully fails to transmit or forward such money promptly, the notary is personally liable for any loss sustained because of such failure. The person or persons damaged by such failure may bring an action to recover damages, together with interest and reasonable attorney fees, against such notary public or his bondsmen.